IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 4, 2010

## STATE OF TENNESSEE v. DOMINIC DELVEKIO CARTER

**Direct Appeal from the Circuit Court for Madison County**
**No. 08-387      Donald H. Allen, Judge**

**No. W2009-01612-CCA-R3-CD  - Filed June 10, 2010**

Following a jury trial, the defendant, Dominic Delvekio Carter, was convicted of three counts of aggravated rape, one count of aggravated burglary, and one count of theft of property under $500.  The trial court sentenced the defendant as a multiple rapist to an effective sentence of fifty years at 100% in the Department of Correction.  On appeal, the defendant argues that the evidence was insufficient to support his convictions and that the trial court erred in imposing consecutive sentencing.  Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and D. KELLY THOMAS, JR., JJ., joined.

George Morton Googe, District Public Defender; and Gregory D. Gookin, Assistant Public Defender, for the appellant, Dominic Delvekio Carter.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The victim, B.F.,[1] testified that on September 21, 2007, she and her boyfriend lived together in a Jackson apartment.  Her boyfriend was out of town at the time, and the victim

---

[1] It is the policy of this court to refer to victims of sexual offenses by their initials.

spent the prior evening with some friends before returning home around 5:00 a.m. While she was in her bedroom undressing to take a shower, she heard a noise and thought it was her boyfriend returning home. However, she discovered the defendant who was dressed in all black and wearing a black mask "where you couldn't see nothing but the eyes." The defendant pointed a gun at her and told her that her boyfriend owed him some money. He then told her to stay calm and to perform oral sex on him. Because she was afraid the defendant would hurt her, the victim complied with his demand. The defendant then told her to turn around, and he performed oral sex on her. The victim said the defendant then put his penis inside her vagina and ejaculated. Afterwards, the defendant told the victim to wash herself, so she went to the bathroom and ran some water in the bathtub. The defendant told her he wanted to have sex again and for her to lie down on the bed. The defendant then put his penis inside her vagina and "stopped after a while." The victim said she sat in the bathtub but did not wash herself. The defendant asked her for a drink of water, and she heard water running in the kitchen. The defendant told her to open the front door and let him out, which she did. The victim said she was terrified and called her mother who called the police. The victim said she was taken to the Jackson Madison County General Hospital where she was examined and swab samples were taken.

The victim said that, after the defendant left, she noticed that about $80 was missing from her purse. The victim said that she did not know how the defendant had gained entry to her apartment and that the door was locked when she arrived home that morning. She said that, in February 2008, she identified the defendant from a photographic lineup and was able to identify him by his eyes. She also identified the defendant in the courtroom as the man who broke into her home and raped her.

Officer Rolanda Edward James of the Jackson Police Department testified that he responded to a sexual assault call at the victim's residence at about 6:45 a.m. on September 21, 2007. After Officer James took the victim's statement, he investigated the area around the victim's apartment and discovered that the screen on a small window had been removed. He collected various items into evidence, including a white tissue, a wash cloth, a towel, a comforter, and a blue plastic cup.

Becky Chilcutt, a sexual assault nurse examiner at the Jackson Madison County General Hospital, testified that she performed a rape kit on the victim and collected oral and vaginal swabs from her, as well as swabs from her lower back.

Investigator Danielle Jones of the Jackson Police Department testified that she took the victim's statement at the hospital the morning of the incident. She said that the defendant was subsequently developed as a suspect in the case. Investigator Jones prepared a photographic lineup which she showed to the victim on February 20, 2008, and the victim

identified the defendant. She said that following the defendant's arrest in April 2008, she collected buccal swabs from him for DNA testing.

Investigator Tyreece Miller of the Jackson Police Department testified that the defendant signed a waiver of rights form on April 10, 2008, after which he gave the following statement to Investigator Miller:

> I have raped/violated a woman in my past. It happened some time last year. I was living at Crestview Apartments. I broke into this woman's house. I was inside taking property when the girl came in on me. She was a black female. She was so scared and nervous. I performed oral sex on her and I had sex with her "doggie style." I had a gun. It was, more than likely, a revolver. I didn't have no intentions of hurting her. I just wanted to calm her down. After I had sex with her[,] I took between $60-$80 because I was broke. I got in the apt. through the front door. It was unlocked and I just went in. I broke into her house just to steal but I've never done that before. I don't remember the address[,] but it was the street over from Crestview Apartments.

When asked to explain the "raped/violated" wording of the defendant's statement, Investigator Miller said that the defendant admitted he raped the woman which was what Miller initially wrote down, but, after reading the statement, the defendant said he did not like that word and wanted to change it to "violated" because it did not "sound as bad." Investigator Miller then crossed out "raped" and wrote in "violated," and the defendant initialed the changes. Investigator Miller said that the Crestview Apartments were located within a block of the victim's residence and that a person could easily walk that distance in less than five minutes.

Qadriyyah Debnam, a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified that she analyzed the buccal swab taken from the defendant, from which she was able to develop a complete DNA profile.

Lawrence James, a forensic scientist with the TBI, testified that he analyzed the rape kit collected from the victim. His examination of the victim's vaginal swabs revealed the presence of sperm cells from which he was able to develop a DNA profile. Because the perpetrator was unknown at the time of the analysis, the DNA profile was generated into a printed profile and entered into the Federal Bureau of Investigation's DNA database, CODIS. James also analyzed the swabs taken from the victim's lower back which revealed the presence of sperm cells. The DNA profile from the sperm cells on the lower back swabs matched the profile he obtained from the victim's vaginal swabs. James said he subsequently learned that Agent Debnam had formulated a DNA profile of a subject which also had been

placed in the CODIS system. James compared the DNA profile he generated with the defendant's profile that Agent Debnam had generated and determined that they were a match.

**Defense Proof**

The twenty-seven-year-old defendant testified that he had known the victim for "a matter of weeks" prior to September 21, 2007, and that they had an intimate relationship. He described what happened on the day of the incident:

[O]n this specific night, she wanted me to go and not come back, but I refused and I was telling her that I was going to ruin her relationship with her boyfriend and stuff. And one thing led to another and we were kind of arguing and stuff about the situation and she was telling me that I needed to leave before her boyfriend came or whatever. In the process of that, . . . I was trying to have sex with her at least one more time before I left or whatever and she was kind of like, she didn't tell me no, but she was kind of in a way like wanting it at the same time I guess. I don't know. That's just from my understanding. Maybe she did or maybe she didn't. I just kept on applying pressure and eventually she broke and we had sex and I performed oral sex on her to kind of enhance the moment or whatever. In the process of us having sex, she told me to stop and I stopped. She got up and she went to the bathroom and started running water and stuff and she told me that I needed to hurry up and go. I was almost in the heat of the moment so I was trying to finish and continue . . . this situation with her and I kept applying pressure and she eventually let me get back on top of her or whatever and that's when I told her to turn around and I ejaculated on her back or whatever. She was mad about that or whatever, but she kept telling me I needed to hurry up and go, but I was still stalling around in the house and kind of agitating her I guess . . . and I asked for some water before I left and she followed me in the kitchen. She was telling me, . . ., to hurry up and I was like you are going to have to call the police on me and just agitating her and aggravating her or messing with her or whatever and I guess she took it serious or thought I was crazy or whatever.

Regarding the statement he gave to the police, the defendant said he told Investigator Miller that he had never raped a woman but had "violated" a woman. The defendant said he eventually admitted his involvement with the victim because "it just kept hitting me in my head at the time if DNA came back with this girl, I didn't know what was going on. I knew I had been intimate with her or whatever."

-4-

On cross-examination, the defendant said that he and the victim had consensual sex. Asked why he did not tell that to Investigator Miller, the defendant replied, "At first I was in denial trying to get myself out of the situation. I was scared for my life. [Miller] was threatening to lock me up for the rest of my life about this stuff." Asked about his statement to Miller, the defendant said, "I basically went along with his story line because I knew they would probably believe a woman over me anyways and, plus, I didn't want to ruin my reputation with my family and my woman that I was in a relationship with with [sic] two kids with." The defendant denied that he took any money from the victim although he signed his statement saying that he did. The defendant admitted that he initially denied anything had happened between him and the victim but then changed his story.

In rebuttal, the State recalled the victim who testified that she did not know the defendant and had never seen him before the day of the incident and that he forced her to have sex with him.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions for aggravated rape and aggravated burglary, saying that he was engaged in a consensual sexual relationship with the victim and that he did not enter her apartment without permission. The State responds that the evidence was sufficient to sustain the defendant's convictions.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To obtain a conviction for aggravated rape, the State was required to prove:

(a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon[.]

Tenn. Code Ann. § 39-13-502(a)(1) (2006).

For the aggravated burglary conviction, the State had to prove beyond a reasonable doubt that the defendant entered a habitation without the effective consent of the owner and with the intent to commit a theft. Id. §§ 39-14-402(a), -403(a). A habitation is defined, as "any structure . . . which is designed or adapted for the overnight accommodation of persons[.]" Id. § 39-14-401(1)(A).

As we have set out, the victim testified that the defendant broke into her apartment, forced her to perform oral sex on him, performed oral sex on her, and then twice penetrated her vagina. The two acts of vaginal penetration were separated by the victim's going to the bathroom, after the defendant told her to wash herself. On appeal, the defendant argues that the jury should not have accredited the victim but instead believed his testimony that the two had been in a romantic relationship and that the sexual acts were consensual. However, it is for the jury and not this court to assess the credibility of witnesses. In this matter, it is apparent from the verdicts that the jurors believed the victim, rather than the defendant, and

the record supports this determination. As to proof of the theft, the victim said that, after the defendant had left her apartment, she discovered that $80 was missing from her purse. Additionally, in his statement, the defendant admitted that he had taken between $60 and $80 from the victim. Accordingly, we conclude that the evidence was sufficient to sustain each of the convictions.

## II. Sentencing

The defendant argues that the trial court erred in imposing consecutive sentencing, and the State responds that the trial court properly sentenced the defendant.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103,-210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2).

The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

In sentencing the defendant, the court enhanced the defendant's sentence based on his previous history of criminal convictions or criminal behavior, the defendant previously had failed to comply with the conditions of a sentence involving release in the community, and the crimes were committed while he was on probation. See Tenn. Code Ann. § 40-35-114(1), (8), (13)(C). The court gave the enhancement factors great weight. The court determined that the appropriate sentence was twenty-five years for each of the three aggravated rape convictions, six years for the aggravated burglary conviction, and eleven months, twenty-nine days for the theft conviction.

Finding the defendant to be an offender whose record of criminal activity is extensive and that he committed the offenses while on probation, the court ordered that one of the aggravated rape sentences be served consecutively:

> [T]he Court does find that the defendant in this case is an offender whose record of criminal activity is extensive. Now, specifically I'm talking about the fact that he had 10 prior misdemeanor convictions prior to these offenses taking place or prior to the trial taking place. He has four felony convictions for which he was convicted of at trial, plus he has an additional misdemeanor theft conviction involved in this case. When you consider all of that, he has in the Court's opinion a very extensive criminal history of criminal activity. Also the Court finds that the defendant is being sentenced for offenses that were committed while he was already on probation. As I talked about earlier, he was already on probation for [an] 11 months and 29 day sentence when he committed each of these. . . .
>
> The Court finds that based upon all of these factors this extensive history, the fact that he was already on probation when he committed these offenses, the Court finds that at least one of these sentences for aggravated rape should run consecutive to the others. . . .
>
> Now, the Court finds that this total aggregate sentence of 50 years reasonably relates to the offenses for which the defendant stands convicted. The Court also finds that confinement for this extended period of time is necessary to protect society from a defendant who has an unwillingness to lead a productive life and whose life-style is basically committing crimes. That's pretty evident when you look at this history when he says in his own statement and again this was read to the jury he talks, . . ., how he broke in to get money

and then he . . . forced this woman to have sex with him on these occasions and he had a gun with him. You know, that was all part of the proof about how he committed this offense. So the Court finds that there is the necessity to have at least that one count run consecutive to the others.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is an offender whose record of criminal activity is extensive" or that "[t]he defendant is sentenced for an offense committed while on probation[.]" Tenn. Code Ann. § 40-35-115(b)(2), (6) (2006).

It is readily apparent from the record that the trial court considered all required sentencing principles and evidence in setting the sentences and the manner in which they were to be served. The defendant's response on appeal to the court's findings in setting his sentences is that the date of the offenses which are the basis for the present appeal "fell within a year of his probationary sentence from Jackson City Court" and that his ten prior misdemeanor convictions do not constitute an "extensive" criminal history. Unfortunately, under Tennessee law, he was either on probation at the time of these offenses or he was not; he receives no credit for being near the end of his probationary period. Further, we agree with the trial court that the defendant's ten prior misdemeanor convictions constitute an "extensive" criminal record. Accordingly, we conclude that the trial court appropriately sentenced the defendant.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE